## Home Ins. Co. v. P'Pool.

(Decided March 13, 1936).

F. M. DRAKE and BLUE & ELDRED for appellant.

LORENZO K. WOOD and CHARLES A. PEPPER for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellee, prior to and on February 8, 1932, was operating a general store in Caldwell county, and in April, 1931, took out a one-year policy with appellant, insuring his furniture and fixtures to the amount of $600; on December 12, 1931, a one-year policy insuring his building for $600, and on February 1, 1932, another policy insuring the stock of goods for $1,500. It is admitted that on February 8, 1932, all the policies were in effect, and it seems to be beyond dispute that there was a total loss of the insured property on that date. Each of the policies contained the following clause:

"This Company shall not be liable for loss caused

directly or indirectly by; * * * or (unless fire ensues and in that event for the damages by fire only) explosion of any kind. * * *"

Appellee filed his petition in February, 1933, and alleged a total loss of the insured properties by fire, and sought to recover the aggregate of the three policies. Appellant answered, denying the allegations of the petition, pleading affirmatively the conditions of the policies above set out, and further pleading that the alleged losses set up in the petition were solely the result of an explosion and that no fire ensued.

The cause was submitted to a jury, resulting in a verdict in favor of appellee for $1,750, with interest, though the property was insured for $2,700. Motion for a new trial being overruled, judgment was entered in accord with the verdict, and appellant prosecutes this appeal, insisting that it was entitled to a peremptory instruction and that the instruction given for appellee was faulty and prejudicial. These presentations require some attention to, and recitals of, the proof.

The appellee says that at about 10 minutes after 11 o'clock on the day above stated he had waited on a customer who was about to and did leave. They noticed some smoke coming out from under the side room at the front door and through the cracks of the side room. He says that he went off the porch and looked under the room to see if he could tell where the fire was. He was out there, as he says, "possibly two minutes trying to discover where the fire was." He then said that he believed the fire was in the side room, and went first into the main building and saw no smoke in there, and, walking to the door which opened from the store into the side room, "opened the door to the side room and there was a flash of fire hit me in the face and that is the last I remember."

He described the building as having been a one-story frame, metal roof, the store 60x22, and the side room 60x14, facing west on one of the crossroads, one side being flush with the road on the north side. There appears to have been a porch on the front, extending the entire width of the store and the side room. The building was set on stone pillars, and was 18 inches from the ground level in front and about 2 feet from the level in the rear. As indicated, the merchan-

dising and merchandise was in the main store. In the side room was kept coal oil, lubricating oil, axle grease, and trash such as may be found around a general store. The stove was in the main room, but neither appellee nor any one testifying recalls whether or not there was a fire in the stove. There is no suggestion that there was a place for a fire in the side room.

Persons who were near-by and came to the store shortly after an explosion was heard and felt found appellee in the debris, unconscious and suffering severely. He was taken to a hospital and remained there until March 30th, or thereabout.

Harold McNabb, a witness, was at the store when appellee was waiting on a customer. When witness started out of the store, he noticed smoke coming from under the porch of the main store. Appellee and his customer were also out there, and appellee went around back of the house to try to find "where the smoke was coming from and then went into the front door." Witness was then on the ground looking under the porch. Witness says: "When I seen the smoke after Mr. P'Pool went back in the building, after he started in the store, ever what it was went off." The explosion blew witness "across the road somewhere." He describes the noise resulting from the explosion as being "just like a blast," and he says he thought he heard "two noises," and describes the smoke as being "black." He thinks that from the time he first noticed the smoke until the "thing blew up" was perhaps three or four minutes.

Frank Jones was at the store, and had just left before "anything unusual happened." Curt Townes was with him, and they were in a car. They had driven for some four or five minutes when they heard a noise and felt a jar of the car. They immediately turned and went back to the store and found it "afire and all torn down." "A fire was up in the top of the pile of kindling." It appeared to him the fire was "back from the front door, and kind of back toward the door that went in the side room." He describes the fire as being in "just a great big pile of kindling, about two and a half feet high." He heard appellee groaning, and, after throwing one bucket of water on the fire, went with others to his rescue, and found him with two feet of kindling stuff piled over him."

He could not say whether appellee was burned or not. He also says he drove hurriedly after the explosion and noticed black smoke, but when he left the store he noticed nothing unusual, and detected no smell of smoke and saw no fire. He further states that, when he heard the noise and looked back, "there was no store building where it had just been." This witness also says he saw a hole in the ground between where the stove was in the main store and the road on the north side; the hole looking like a crater about 4 feet across and something like 2 feet deep, apparently freshly made.

The doctors who were called to attend appellee describe his condition as being "all torn up, unconscious, his clothing torn off, his face skinned, and covered with dust, dirt and stuff." There was some evidence of a parched condition of the skin on both sides of his face.

Curt Townes, who was with witness Jones in the car when the explosion occurred, testifies in the main as did his companion, so much so that it need not be recounted.

King Oliver lived near the crossroads and was at the store just before the "occurrence took place." He heard the noise, went at once to the store and found it when he got there "just all up in a pile where the store was"; that he saw some fire about 20 feet from the front door near the side door leading into the side room "aright smart little fire, something like 2 feet. I broke after water to put it out." Three or four others were there, and it took them fifteen or twenty minutes to put the fire out.. On cross-examination he said that he had gotten only two or three hundred yards from the store when it blew up. He noticed no smoke or anything unusual when he left the store "just a mighty few minutes" before the explosion.

Hugh Hart went by appellee's store and saw a fire "something like two feet high" near the side room where Mr. P'Pool was lying. No evidence of fire save at the point indicated. He was about 50 yards from the store when "something happened"; it felt like an "explosion," and came from the direction of the store.

The foregoing was in substance the proof adduced by appellee. Appellant introduced Mr. Goodwin, who

lived about 500 yards from the store. He was at home on the morning of February 8th, heard the explosion, and saw its immediate result. He was about five minutes getting over to the store. His brother and King Oliver were using buckets to put the fire out. He describes it as only "a smoke, I did not see any fire."

M. P. Brown, a justice of the peace, went to the scene about 2:30 p. m. of February 8th. He examined a hole in the ground at a point underneath the wreckage. He described it as being about 18 inches deep, with a lot of loose dirt in it. He found in the hole "a number of metalic pieces of what appeared to have been an alarm clock." Some of the pieces were found in the loose dirt and some imbedded in the solid earth forming the sides of the hole. Some of the parts were springs, wheels, and shafts upon which the wheels run. He described the hole as being 10 to 12 feet from the back part of the store. He also noticed what he described as a "peculiar odor," something like dynamite.

Frank A. Mack, a police officer of Louisville, visited the scene with the sheriff of Caldwell County, or one of his deputies; he qualified as an expert on bombs, and went into detail as to the make-up, character, and operation of what are commonly known as "time-clock" or "alarm-clock" bombs. It is useless to go into details here, but we may point out that in describing the mechanism he showed how the ball which struck the bell on an alarm clock was removed, together with the bell, and in their respective places were substituted a match and sandpaper, and at the proper time the matches frictioned against the sandpaper, and set off some powder which in turn ignited a fuse, which was timed (by length) to explode a detonating cap, which in turn exploded the dynamite. He saw the hole, described as a crater, several feet in diameter and about 20 inches deep. He also testified that in an explosion of dynamite by means of fuse and a dynamite cap there occurred two explosions, the first very light and the second heavy, the latter accompanied by a highly visible flash.

Dow Morse, a deputy sheriff, arrived at the store about 12:30 on February 8th, "the store had been wrecked by an explosion, I thought. The rear end of the floor had been blown away." None of the building was left. He saw the craterlike hole.

No witness testified that there was any loss of the insured property by fire. Of course it may be said that from the time he was knocked helpless Mr. P'Pool saw nothing more. But other witnesses were there, and none of them describe any loss except by explosion, save one or two who describe the afterfire as burning a lot of kindling, trash, or wreckage. Mr. P'- Pool estimated the reasonable values, as of February 8, 1932, fixtures, $1,200; building, $1,200; and merchandise, $3,500; insurance, $1,500. He says the salvage had no value at all.

Upon submission of the case to the jury, the court over objection and exception of appellant gave the following instruction:

"The court instructs the jury that if you believe from the evidence that there was a fire on the insured property of plaintiff on the 8th day of February, 1932, exclusive of the stove before the explosion took place, if one did take place, then the law is for the plaintiff and you will so find, assessing his damages at any sum, not in excess of $2,700.00."

At first blush this instruction appears to be erroneous and prejudicial to appellant's rights under the law. Both parties here rely to a great extent, in fact it may be said wholly, on this court's pronouncement of the law in the case of New Hampshire Fire Ins. Co. v. Rupard, 187 Ky. 671, 220 S. W. 538, 541, which we think clearly defines the law, but in no sense would authorize the instruction given by the court. The jury had only to believe under the instruction that there was a fire on the premises "before the explosion took place" in order to find for plaintiff, without regard to whether the fire caused the explosion or caused the destruction of the property, and totally regardless of whether or not it was such a fire as being unquenched would have caused the destruction. Under the instruction the jury could assume that the match, if one was attached to the explosive substance, or arranged so as to cause the explosion, would constitute a "fire" in contemplation of law. Thus the jury was given too much range, particularly in the light of the proof.

There was no proof at all in this case that the

fire (as defined in the Rupard Case, supra) was of such nature that, if not put out, would have destroyed the building; in fact, there was a total lack of evidence of any previous fire at all. True, the appellee and witness McNabb saw smoke, and made a rather diligent examination for a smoke-producing fire, but according to both, none was found. Neither of these witnesses was asked nor did they undertake to say or intimate that there was a fire, such as, if unchecked, would have caused destruction. It is true that three witnesses were asked substantially the following question: "Q. The fire you saw, was that such a fire as would have burned that building and those around it if it had not put it out?" One witness answered: "I guess it would." Another said: "I would judge that it would have been only a short time until it would have burned. It was burning when I got there." Another said: "It was such a fire as would have destroyed the building had it been standing." All these witnesses arrived on the scene after the explosion which had attracted them to the place.

It is true that appellant, when asked what caused the destruction of his property answered, "Fire," but from his description of the situation prior to the explosion he was merely assuming there was a fire. Even when asked what was the color of the "flash" which he says met him when he opened the door, whether it was "red or white," he replied, "I would not say." He also admitted that a grand jury of Caldwell county had indicted one Merrick for dynamiting his store.

Counsel in argument before the jury and in brief on appeal insist that there was a precedent fire, which, unquenched would have destroyed the property and therefore the appellant was liable and the instruction proper, and that the court correctly overruled appellant's motion for a peremptory instruction. They say that if a match was used as a part of the dynamite bomb which caused the explosion, there was a precedent fire; that smoke was seen coming out from under the building, and that appellee was met with a flash which knocked him unconscious, when he opened the side door, thus indicating fire, and that fire burning in the wrecked building after the ex-

plosion was evidence of a fire which would have caused destruction.

We do not think this position is well taken. As we have read all the evidence, we find no substantial proof of a pre-existing fire. We find no evidence which would lead us to the conclusion that, if there was a pre-existing fire, it was such as would have caused destruction. We express no doubt but that appellee's property was almost, if not totally, destroyed by the explosion. After the explosion, as we read the record and view the photographic evidence, there was little to burn, save debris, or, as some witnesses describe it, "wreckage."

Agreeing with both parties that the Rupard Case, supra, is a fair exposition of the law, we shall accept it as such and give it application here, as briefly as possible. In that case the court held the exception, the same as contained in appellant's policy here, to be an enforceable one, the facts justifying reliance upon it. In that case the court found little difficulty in deducing from the proof two conclusions, viz., that there was a precedent fire which caused the explosion which followed, and that the precedent fire was a real fire, such as would, if not promptly quenched, destroy the property there involved.

The court went at length into the distinction in the application of the law, where there was an explosion and the exempting clause was or was not written into the policy. It would serve no purpose here to undertake to again make such distinctions. In the course of the opinion the court said:

"It must also, of course, be conceded that there is no liability upon an insurer under a contract which insures against risk from fire only for damages caused by an explosion, unless there is an ignition or burning in whole or in part of the insured property by a fire, as the term is commonly understood, either as a cause of or in consequence of the explosion. However, the general rule prevailing is that an insurer under a contract which insures against losses from fire is liable for damages caused to the insured property by an explosion where there is a fire, as such.

terms are popularly understood, burning in the property and it is followed by an explosion which is an incident of or is caused by the fire. In such instances, it is considered that the entire loss, both from the fire and the explosion, is a loss caused by the fire, and this rule of liability is applied to the insurers under the contracts which except the risks of explosions as well as those which do not except such risks. The fire in such instances is held to be the proximate cause of the entire loss. [Here citing numerous cases.] * * *

"Under contracts for insurance against fire, containing the above stipulations, as heretofore stated, the insurers are not liable for any damages to the insured property caused by an explosion which is not preceded by fire which causes it, or of which it is an accident. If a fire precedes the explosion and causes it, then the entire damages caused by both the fire and the explosion, are, under the general rule, as above stated, held to be damages by fire, and are within the risks insured against"—citing cases.

The court then lays down very clearly the meaning of the word "fire" as used elsewhere in the opinion, as follows:

"From the above authorities, a rule is deducible by which to determine the character of the fire which must precede the explosion and ignite the explosive substance or cause the formation of the substance causing the explosion in order that the effects of the explosion may be taken out of the exception in contracts for the insurance against losses by fire, as in the instant case. Such a fire is substantially defined in Home Lodge Association v. Queen Ins. Co., supra [21 S. D. 165, 110 N. W. 778], as such a fire that, if it had pursued its natural course, would have resulted in a total or partial destruction of the property insured. Such a fire is defined substantially in the same way in Transatlantic Fire Ins. Co. v. Dorsey, supra [56 Md. 70, 40 Am. Rep. 403], and in German American Ins. Co. v. Hyman, supra [42 Colo. 156, 94 P. 27, 16 L. R. A. (N. S.) 77]."

It is not deemed necessary to go into details taking up each of the branches of argument which advance various theories as tending to show a previous, sufficiently destructive fire. The match theory was dealt with in Phœnix Ins. Co. v. Greer, 61 Ark. 509, 33 S. W. 840, and in Mitchell v. Potomac Ins. Co., 183 U. S. 42, 51, 22 S. Ct. 22, 46 L. Ed. 74, both cited with approval in the Rupard Case. If there was a match used (it only being mentioned by the witness describing the mechanics of a time-clock bomb), it was part and parcel of the bomb and an incident to the explosion. The smoke and flash which are insisted upon as being indicative of antecedent fire, which would have caused destruction, do not in any wise measure up to the fire shown to have existed in the Rupard Case nor to the definition of a "fire" in that case.

We note that the court in the Rupard Case we said that the issues therein were submitted under instructions, "which defined the rights of the parties, in substantial accord with the principles herein expressed," and, going to that record, we find that an instruction given by the lower court and approved by this court is as follows:

"Although the jury may believe from the evidence that some portion of the damage the plaintiff sustained was caused by an explosion of gas underneath the floors of the building in which the insured property was located, yet if they further believe from the evidence that a fire preceded the explosion, which was such a fire that if it had pursued its natural course would have resulted in the total or partial destruction of the property insured, and that said fire caused the explosion, they should in fixing the damages, be governed by the first instruction."

The first instruction referred to fixed the measure of damages. We quote the above irstruction for the purpose of showing wherein the instruction in the instant case was far from giving to the jury the law of the case, even if the facts as adduced warranted it.

However, from a careful survey of the record, we

conclude that the facts were not of that quality or character which justified a submission to the jury; hence we are impelled to reverse the judgment, with directions to the court below to grant a new trial consistent with this opinion.

Judgment reversed.